No. 23-01872

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

## NICHOLAS SOMBERG,
*Plaintiff-Appellant*

## KAREN D. McDONALD,
In Her Official Capacity,
*Defendant-Appellee*

On Appeal From the United States District Court
for the Eastern District of Michigan—Southern Division
The Hon. Gershwin A. Drain, United States District Court Judge

_____

# BRIEF *AMICUS CURIAE* OF
# THE SOCIETY OF PROFESSIONAL JOURNALISTS AND
# THE NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION
# IN SUPPORT OF APPELLANT URGING REVERSAL

_____

*/s/ Andrew Geronimo*
ANDREW GERONIMO (OH# 86630)
andrew.geronimo@case.edu
*/s/ Sara E. Coulter*
SARA E. COULTER (OH# 96793)
sara.coulter@case.edu
*/s/ Siobhan Gerber*
SIOBHAN GERBER (OH# 101563)
siobhan.gerber@case.edu

**First Amendment Clinic**
MILTON & CHARLOTTE KRAMER LAW
CLINIC
CASE WESTERN RESERVE UNIVERSITY
SCHOOL OF LAW
11075 East Boulevard
Cleveland, Ohio 44106
Telephone: (216) 368-2766

*Counsel for Amicus Curiae the Society of Professional Journalists and the National Press Photographers Association*

## CORPORATE DISCLOSURE STATEMENT

The Society of Professional Journalists ("SPJ") is a nonprofit membership organization devoted to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press. The SPJ has no shareholders and does not own, and is not owned by, any other corporation.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism community. Since its founding in 1946, the NPPA has been the *Voice of Visual Journalists*, vigorously promoting the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The National Press Photographers Association does not have a parent company and issues no stock.

ii

## RULE 29(A)(4)(E) STATEMENT

*Amici* affirm that no party, or party's counsel, have authorized, contributed to, or contributed money toward the preparation or filing of this brief.

# TABLE OF CONTENTS

I.  INTRODUCTION AND SUMMARY OF ARGUMENT..................................1

II.  THE REBROADCASTING BAN IS A PRIOR RESTRAINT REQUIRING STRICT SCRUTINY..................................................................................2

III.  THE REBROADCASTING BAN FLUNKS STRICT SCRUTINY BECAUSE IT IS NOT NARROWLY TAILORED .............................11

IV.  THE TRIAL COURT FAILED TO ACKNOWLEDGE DECADES OF JUDICIAL DISFAVOR FOR "CONTEMPT BY PUBLICATION" ....................16

V.  CONCLUSION...................................................................................19

# TABLE OF AUTHORITIES

## Cases

*ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) ......................................6

*Animal Legal Defense Fund v. Kelly*, 9 F.4th 1219 (10th Cir. 2021)......................6

*Animal Legal Defense Fund v. Reynolds*, 8 F.4th 781 (8th Cir. 2021).....................6

*Animal Legal Defense Fund v. Wasden*, 878 F. 3d 1184 (9th Cir. 2018).................7

*Bantam Books v. Sullivan*, 372 U.S. 58, 70 (1963) ........................................5

*Bridges v. Calif.*, 314 U.S. 252, 193-94 (1941) ...........................................20

*Connell v. Town of Hudson*, 733 F. Supp. 465 (D.N.H. 1990)...........................9

Cox Broadcasting Corp. v. Cohn, 420 U.S. 469 (1975) ..................................4

*Cox v. Louisiana*, 379 U.S. 536 (1965) .....................................................5

*Craig v. Harney*, 331 U.S. 367, 373 (1947)...............................................20

*Dorfman v. Meiszner*, 430 F.2d 558, 563 (7th Cir. 1970) ..............................15

*Fields v. City of Philadelphia*, 862 F.3d 353, 358 (3d Cir. 2017) ......................6

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989) ........................................ 13, 14

*Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) ...........................7

*Glik v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011) .......................................7

*In Matter of Turner*, 174 N.W.2d 895, 904 (Mich. App. 1969) ........................22

*Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022)........................................6

*Nat'l Pub. Radio, Inc. v. Klavans*, 560 F.Supp.3d 916 (D. Md. 2021) ................11

*Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 559 (1976) ........................3, 18

*New York Times Co. v. United States*, 403 U.S. 713 (1971) ............................4

*Nye v. United States,* 313 U.S. 33, 49-50 (1941)........................................19

*Pennekamp v. Florida*, 328 U.S. 331 (1946).............................................20

*People of Virgin Islands v. Brodhurst*, 148 F.2d 636, 643 (3d Cir. 1945) ............23

*Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37 (1983) ..................9

*Regan v. Time, Inc.*, 468 U.S. 641, 643-44, (1984) ......................................8

*Sable Commc'ns of Cal., Inc. v. Fed. Commc'ns Comm'n*, 492 U.S. 115 (1989).....5

*Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000)........................7

*Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979)................................3, 10

*Soderberg v. Carrion*, 2022 U.S. Dist. LEXIS 222645, No. RDB-19-1559 (D. Md.
  Dec. 9, 2022)........................................................................ 10, 14

*Soderberg v. Carrion,* 999 F. 3d 962 (4th Cir. 2021)...................................2, 9

*Stanley v. Georgia*, 394 U.S. 557 (1969)..................................................12

*State ex rel Oklahoma Bar Ass'n v. Porter*, 766 P.2d 958 (Okla. 1988)................22

*State v. Morris*, 406 P.2d 349, 357 (N.M. 1965) ...................................................22

*Turner v. Driver*, 848 F.3d 678, 688-89 (5th Cir. 2017) ..........................................6

*United States v. Cicilline*, 571 F.Supp. 359, 362 (D.R.I. 1983) .............................12

*United States v. Dickinson*, 465 F. 2d 496, 507 (5th Cir. 1972)........................4, 21

*United States v. Stevens*, 559 U.S. 460, 482 (2010) ..................................................8

*W. Watersheds Project v. Michael*, 869 F.3d 1189, 1196 (10th Cir. 2017) .............7

*Wood v. Georgia*, 370 U.S. 375, 389 (1962) ...........................................................21

## Other Authorities

Ariel L. Bendor & Michal Tamir, *Prior Restraint in the Digital Age*, 27 Wm. &
    Mary Bill Rts. J. 1155, 1159 (2019)....................................................................2

Clay Calvert, *Iancu v. Brunetti's Impact on First Amendment Law: Viewpoint
    Discrimination, Modes of Offensive Expression, Proportionality and Profanity*,
    43 Colum. J.L. & Arts 37, 56-57 (2019) ...........................................................14

Matthew Bultman, *Recording Virtual Justice: Cameras in the Digital Courtroom*,
    90 Fordham L. Rev. Online 103, 114 (2022) ....................................................12

Wash. Post, *Supreme Court hears oral arguments in affirmative action cases*,
    YouTube (Oct. 31, 2022), https://www.youtube.com/watch?v=bMfjga_nDhw.13

## STATEMENT OF INTEREST OF AMICI CURIAE

The Society of Professional Journalists and the National Press Photographers Association together represent thousands of visual journalists across the United States whose profession depends on their ability to gather and share information of public concern safely and without fear of threats or intimidation by government authorities. This case implicates a fundamental constitutional right – the right to publish information that the government has itself chosen to make available – that has been reinforced by unbroken decades' worth of Supreme Court precedent. The rule at issue here (referred to, for brevity, as the "Rebroadcasting Ban") puts a cloud over the rights of SPJ and NPPA members to effectively inform the public about judicial proceedings. *Amici* offer this brief in hopes that the Court will seriously consider the adverse spillover effects of a broadly worded ruling that, if not carefully crafted, could extend governmental censorship authority into every living room – and every newsroom – in America.

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

This case presents a classic First Amendment challenge to a needlessly broad prohibition on speech that chills potential violators with harsh governmentally imposed sanctions. Appellant Somberg asserts his right to be free from the threat of contempt prosecution for publishing information about a judicial proceeding *that the judiciary itself decided* could be streamed on the Zoom video platform without interfering with the interests of justice. The Oakland County District Court rule under which he was threatened with prosecution ("Policy Regarding the Use of Portable Electronic Devices") (hereinafter, "Rebroadcasting Ban") applies by its terms to the areas in and around a physical courtroom – not a "virtual" courtroom accessible anywhere around the world. Applying the rule in such an expansive manner to prohibit republication of information distributed by the court raises obvious overbreadth problems. Nothing in the opinion below demonstrates that the court even examined the government's justifications for a rule purported to outlaw non-disruptive photography – even amateur, at-home photography – that might not be published until day, weeks, or months after a proceeding has concluded.

Once information has been lawfully obtained, the First Amendment vigilantly protects the right to redistribute it. If a court makes an audio or video feed available to the public, a person who redistributes images of the proceedings

1

has strong First Amendment defenses against any judicially imposed penalty. One federal appeals court has already held that a ban on redistributing lawfully obtained recordings of court proceedings implicates the First Amendment and is presumptively unconstitutional absent the most compelling justification. *Soderberg v. Carrion,* 999 F. 3d 962 (4th Cir. 2021). This Court should follow the Fourth Circuit's carefully reasoned opinion, recognize the infirmity of the Rebroadcasting Ban, vacate the district court's opinion, and remand the case for a proper application of strict scrutiny to the Rule.

## II.    THE REBROADCASTING BAN IS A PRIOR RESTRAINT REQUIRING STRICT SCRUTINY

In many ways, the heart and soul of the First Amendment is its proscription against "prior restraints" – that is, government directives forbidding a speaker from publishing information. *See* Ariel L. Bendor & Michal Tamir, *Prior Restraint in the Digital Age*, 27 WM. & MARY BILL RTS. J. 1155, 1159 (2019) (explaining that "the government and the courts are not permitted to restrain expressions before they are disseminated – either by administrative licensing regimes or by judicial injunctions – even if they may be constitutionally subjected to subsequent civil or criminal sanctions"). In a case invalidating a judicial gag order that restricted news reporting about details of a high-profile crime, the Supreme Court held that "prior restraints on speech and publication are the most serious and the least tolerable

infringement on First Amendment rights." *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 559 (1976). The disfavor for prior restraint means that, beyond the most extraordinary circumstances, the government may not condition the ability to speak on receipt of government permission – just as the Rebroadcasting Ban has been interpreted to do here, by requiring advance judicial approval before photographing a livestreamed hearing.

The Supreme Court has interpreted the First Amendment to preclude penalizing news organizations for disseminating even highly sensitive and unflattering information that the government has itself made publicly accessible. *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97 (1979); *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975). Indeed, the First Amendment is such strong medicine that it even protects the right to publish material that has been obtained illegally by a journalist's source, as the Supreme Court held in its landmark "Pentagon Papers" case involving leaked national security documents. *New York Times Co. v. United States*, 403 U.S. 713 (1971). The constitutional right to publish lawfully gathered information applies with full force to information about trials, as well. As one federal appeals court summarized the formidable body of speech-protective precedent: "[N]o decision, opinion, report or other authoritative proposal has ever sanctioned by holding, hint, dictum, recommendation or otherwise any judicial prohibition of the right of the press to publish accurately reports of proceedings

3

which transpire in open court." *United States v. Dickinson*, 465 F. 2d 496, 507 (5th Cir. 1972).

Any regulation that restrains speech comes with a heavy presumption of unconstitutionality. *Bantam Books v. Sullivan*, 372 U.S. 58, 70 (1963). Such a restraint will be invalid unless it surmounts "strict scrutiny," meaning that it is the least speech-restrictive means to accomplish a compelling government objective. *Sable Commc'ns of Cal., Inc. v. Fed. Commc'ns Comm'n*, 492 U.S. 115, 126 (1989). Additionally, any requirement to obtain government permission before speaking must contain clear and objective criteria, so the decisionmaker cannot subjectively pick-and-choose which speakers and which messages may be heard. *Saia v. New York*, 334 U.S. 558, 562 (1948). Any law or rule that vests the decisionmaker with unfettered discretion to grant or deny a permit will be unconstitutional. *Cox v. Louisiana*, 379 U.S. 536, 558 (1965).

The Rebroadcasting Ban unquestionably is a prior restraint, and it contains no standards by which permission to engage in expression (that is, to photograph a livestream) is to be granted or withheld. As a threshold matter, the court below plainly erred in characterizing the Rebroadcasting Ban as a restriction on *access* to a public space rather than a restriction on speech. Court after court has recognized the act of photojournalism and videography *as* speech. *Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022); *Animal Legal Defense Fund v. Kelly*, 9 F.4th 1219 (10th

4

Cir. 2021); *Animal Legal Defense Fund v. Reynolds*, 8 F.4th 781 (8th Cir. 2021);

*Animal Legal Defense Fund v. Wasden*, 878 F. 3d 1184 (9th Cir. 2018); *Turner v.*

*Driver*, 848 F.3d 678, 688-89 (5th Cir. 2017). *See also*, *Fields v. City of*

*Philadelphia*, 862 F.3d 353, 358 (3d Cir. 2017)( for the First Amendment's

protection of "actual photos, videos, and records" to have any meaning, the First

Amendment "must also protect the act of creating that material."); *ACLU of Ill. v.*

*Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (the "act of *making* an audio or

audiovisual recording is necessarily included within the First Amendment's

guarantee of speech and press rights as a corollary of the right to disseminate the

resulting recording.")*; Glik v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011); *Smith v.*

*City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (there is a First

Amendment right to record matters of public interest); *Fordyce v. City of Seattle*,

55 F.3d 436, 439 (9th Cir. 1995). Without protection for the act of creating

photographs and video, governments could bypass the Constitution and outlaw

journalism simply by proceeding upstream and damming the source of the speech

by outlawing all of the predicate acts leading up to distribution (taking notes or

photographs, gathering data, operating printing presses, and so on); *W. Watersheds*

*Project v. Michael*, 869 F.3d 1189, 1196 (10th Cir. 2017) (overturning a law that

banned photography and other data collection and citing the "upstream" theory).

First Amendment protections on photography and filming led the Supreme Court

to strike down a law that banned the creation of films depicting animal cruelty[1] and a law that banned creating photographs of money.[2] Any rule that would purport to constrain SPJ's and NPPA's members from taking photos of newsworthy occurrences during livestreamed trials to inform the public is a prior restraint on speech.

Moreover, the only way that an at-home violation will come to the attention of prosecutors and courts is if someone actually *publishes* livestream images. (If Appellee were to take the position that the Rule penalizes undetectably making a screenshot at home as a personal memento – to be shared with no one – the rule would be laughably overbroad, since the government has no legitimate interest in policing private souvenir-collecting.) It is fallacious to ignore that applying the Rebroadcasting Ban to at-home behavior *is* a restriction on publishing.

It was error for the judge to apply "nonpublic forum" analysis to the off-premises conduct of photographers and videographers who could be thousands of miles away from the courthouse. Forum analysis applies when a speaker seeks to use a piece of government property to convey speech in a way that might either interfere with the primary use of the property or falsely suggest that the government endorses the speech. *Perry Ed. Assn. v. Perry Local Educators' Assn.*,

---

[1] *United States v. Stevens*, 559 U.S. 460, 482 (2010).
[2] *Regan v. Time, Inc.*, 468 U.S. 641, 643-44, (1984).

460 U.S. 37 (1983). Neither is the case here. The court's analysis in *Connell v. Town of Hudson*, 733 F. Supp. 465 (D.N.H. 1990), is instructive. The case arose when police interfered with a photographer's newsgathering near a fatal car crash, threatening to arrest him for "disturbing the peace." *Id.* at 467. The *Connell* judge did not analyze the forum status of the property where the photography took place; rather, the judge viewed the matter as a case about the First Amendment right to gather news, and the limits of police authority to interfere with a journalist's lawful behavior. *Id.* at 471. This is a sensible way to analyze the Rebroadcasting Ban as well.

A recent case originating in Maryland illustrates the legal infirmity of restricting the reuse of video that courts have themselves chosen to share. In *Soderberg*, *supra*, the Fourth Circuit invalidated a statute analogous to the one at issue here – known locally as the "Broadcast Ban" – which (while facially applicable to in-person coverage of trials) was interpreted to forbid not only making unauthorized recordings inside the courtroom, but also broadcasting official recordings of criminal proceedings that courts supply to the public. *Id.* at 965.

The Fourth Circuit held the Ban to be a penal sanction for publishing information released to the public in official court records, and thus subject to strict scrutiny. *Id.* at 967-69. "[B]roadcasting of those lawfully obtained recordings," the

court stated, "cannot constitutionally be punished absent a need to further a state interest of the highest order." *Id.* at 969 (citing *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979) (internal quotes omitted)).

On remand, the state argued that the Broadcast Ban served two compelling interests: the protection of witnesses and the integrity of criminal trials. Although the district court deemed these interests compelling, the court found that the ban lacked narrow tailoring; rather, it was "far more expansive than necessary to achieve its desired ends." *Soderberg v. Carrion*, 2022 U.S. Dist. LEXIS 222645, No. RDB-19-1559 (D. Md. Dec. 9, 2022) at *3, *36. In particular, the ban was overbroad because it applied even in routine cases where there was no legitimate fear for the safety of witnesses or the fairness of the trial – and even in such cases, judges had narrower options, such as restricting access to especially sensitive portions of proceedings. *Id.* at *35.

Relying on the Fourth Circuit's ruling in *Soderberg*, a Maryland district court subsequently ruled in favor of NPR in its First Amendment challenge to the same restrictive statute. *Nat'l Pub. Radio, Inc. v. Klavans*, 560 F.Supp.3d 916 (D. Md. 2021). The journalists asked the state attorney general for assurances that, in light of *Soderberg*, the state would not seek criminal charges under the Broadcast Ban for NPR's airing of recordings of trial proceedings, but the state refused to provide such assurances. *Id.* at 922. Following the Fourth Circuit's roadmap in

8

*Soderberg*, the district court applied strict scrutiny and concluded that the

regulation could not constitutionally be enforced against news broadcasters: "[T]he

state's asserted interests in witness protection and trial fairness are too speculative

– and its solution too loosely tailored – to justify prohibiting NPR's broadcast." *Id.*

at 923. While protecting the right to a fair trial is a compelling concern, the judge

wrote, the murder trial NPR intended to cover was already over, and the

generalized concern that broadcast of the recordings might deter jurors from

serving in future cases was too conjectural to sustain a prior restraint. *Id.* at 926.

The *Soderberg* case is especially significant for its refusal to treat a rule

against rebroadcasting court recordings as a mere "time, place and manner"

restriction. The time, place and manner doctrine is a creature of public forum law,

which applies when the government is managing its own property, such as a

municipal park. The same analysis would not apply to expression inside private

homes and offices; for instance, the government could not outlaw viewing

pornographic videos at home by categorizing the prohibition as a mere restriction

on the "manner" of consuming adult content. *Stanley v. Georgia*, 394 U.S. 557

(1969).

The reason the First Amendment tolerates a prohibition against cameras

within the physical confines of the courtroom is that, arguably, a legacy camera is

more physically disruptive to judicial proceedings than other methods of

memorialization, such as writing notes.[3] This is how courts have been able to justify prohibiting what they regard as an especially disruptive *manner* of gathering information, photography and videography with traditionally large and potentially noisy equipment, without advance permission. But in order for a court to conduct a proceeding via Zoom, or broadcast a proceeding on YouTube, a camera is *already* in the courtroom and being used. Recording a livestream while sitting on the couch causes no more disruption within the courtroom than taking written notes from the couch – that is, no disruption at all. Having chosen to put its own camera in the room and stream the proceedings, the court presumably has already taken all of the remedial steps deemed necessary, such as using unobtrusive equipment, and putting participants on notice of the possibility of being recorded. The Supreme Court made this point in *Florida Star v. B.J.F.*, 491 U.S. 524 (1989), involving an attempt to impose civil liability on a newspaper for publishing the name of a rape victim that police had themselves disclosed in a public record. "[W]here the government itself provides information to the media," the Court wrote, "it is most appropriate to assume that the government had, but failed to utilize, far more limited means of guarding against dissemination than the extreme step of

---

[3] Cases disfavoring electronic recording devices in courtrooms invariably point to the potentially distracting effect of conspicuous cameras and camera operators. *See, e.g.*, *United States v. Cicilline*, 571 F.Supp. 359, 362 (D.R.I. 1983) (citing Supreme Court's *Estes* decision and stating that "the right to a fair trial may well demand the absence of a crush of reporters and the accouterments of the broadcasting trade from the courtroom"). Modern cameras that can operate silently, and press pooling arrangements that limit the number of journalists in attendance have made these concerns obsolete in many courtrooms.

punishing truthful speech." *Id.* at 538. The same is true of courtroom videos; if the judge decides a particular portion of a hearing risks exposing uniquely sensitive information, then that portion of the hearing can be closed in accordance with well-recognized constitutional protocols, rather than sanctioning a publisher who – as in *Florida Star* – merely redistributes a record that the court itself has made public. A judge may be allowed to pick-and-choose between newsgathering methods *inside* the courtroom, in which content-neutral restrictions on speech have been permitted. But that authority to manage government premises cannot extend with equal force into a privately owned law office – or a newsroom.

## III.    THE REBROADCASTING BAN FLUNKS STRICT SCRUTINY BECAUSE IT IS NOT NARROWLY TAILORED

Unlike the district court in *Soderberg*, there is no indication below that the district court conducted the rigorous analysis that the First Amendment requires to assess whether the Rebroadcasting Ban is narrowly tailored to achieve compelling government interests. Plainly, it is not. The restraint must be justified by showing that it is necessary to protect the integrity of the judiciary's proceedings. But the rationales commonly offered for judges to restrict recording apply with considerably less vigor once the court has already made the recordings available. By self-publishing the audio or video of a proceeding, the judge has conceded that there is no harm in letting the public listen and watch. *See* Matthew Bultman,

*Recording Virtual Justice: Cameras in the Digital Courtroom*, 90 FORDHAM L. REV. ONLINE 103, 114 (2022) ("When a hearing is held virtually, the court has already made cameras part of the proceeding. If participants' attention is going to be captured by the camera, the damage has already been done. Any additional recording outside the presence of the parties is unlikely to significantly change behaviors.") (internal quotes omitted).

The Ban has obvious spillover effects penalizing entirely benign photography having no effect whatsoever on court functions. Each of these people would be rulebreakers subject to contempt sanction, under Appellee's expansive view of the rule: A lawyer's mother who takes a screenshot of a hearing to memorialize her daughter's first argument. A historian who records a proceeding for use in a biography of an eminent jurist. A documentary filmmaker who captures images from a historic trial for inclusion in a film that will not appear until years after the trial's conclusion. The Ban's lack of tailoring is self-evident. *See Dorfman v. Meiszner*, 430 F.2d 558, 563 (7th Cir. 1970) (striking down prohibition on cameras that extended beyond courtroom into common areas of courthouse: "Any prior restraint on the press must be confined to those activities which offer immediate threat to the judicial proceedings and not to those which are merely potentially threatening.").

It is obvious that many (if not most) judicial proceedings may be recorded and rebroadcast to the public without harm. The U.S. Supreme Court does not purport to require permission before its audio can be republished by others, and indeed, the audio regularly turns up in news coverage of Court affairs. For instance, when the justices heard arguments in a pair of 2022 cases about the role of race in college admissions, the *Washington Post* copied the entire five-and-a-half hours of argument and shared the recording on its YouTube channel. WASH. POST, *Supreme Court hears oral arguments in affirmative action cases*, YOUTUBE (Oct. 31, 2022), https://www.youtube.com/watch?v=bMfjga_nDhw. The Rebroadcasting Ban makes no case-by-case allowances for situations, such as the affirmative-action cases, in which there are no sensitive personal-privacy interests at stake and an overriding public interest in transparency. Had one of those cases been tried in Oakland County, and a blogger had captured an excerpt of court-streamed video for purposes of commenting on the trial and its underlying public-policy issues, the blogger would be courting contempt sanctions, under Appellee's view of the Rebroadcasting Ban. That cannot be the law.

The district court erred in failing to recognize any distinction between a request to bring a camera inside of a courthouse versus what Somberg is requesting here: To be free from punishment for what he does in the privacy of his own office or home, or from publishing freely available public information released by a

13

court. This is a legally significant (and indeed perhaps decisive) distinction. A photographer who seeks to bring a camera inside the courtroom is asserting a "positive" right (that is, a right of access that the court would not otherwise provide), whereas a person who seeks to be free from prosecution for at-home photography is asserting a "negative" right against government overreaching.[4] The First Amendment may or may not protect the former, but it indisputably protects the latter.

The availability of less speech-restrictive alternatives to protect the government's compelling interests demonstrates that a punishment scheme is not adequately tailored. The Supreme Court found in its landmark *Nebraska Press Association* case that a judicial directive against publicizing the defendant's prior confession in a murder case could not withstand strict scrutiny, because the interests of justice could be protected in narrower ways, such as by giving curative instructions to jurors. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976). This outcome demonstrates that, even where the stakes are extraordinarily high, the presumption against inadequately tailored prior restraints is formidable – let alone in a run-of-the-mill civil dispute that, under Appellee's interpretation of Oakland

---

[4] *See* Clay Calvert, *Iancu v. Brunetti's Impact on First Amendment Law: Viewpoint Discrimination, Modes of Offensive Expression, Proportionality and Profanity*, 43 COLUM. J.L. & ARTS 37, 56-57 (2019) (explaining common understanding that "the First Amendment merely extends negative rights against government censorship of speech, not positive ones requiring the government to help promote speech").

County's Rebroadcasting Ban, would be equally subject to restraint and punishment. We do not have the benefit of a *Nebraska Press*-type analysis here, because the court below did not even inquire or examine what interests the Rebroadcasting Ban was serving when applied, as here, to out-of-court photography.

To the extent that there is concern that Somberg's conduct during the pretrial hearing was indecorous, the Oakland County Prosecutor itself supplied a more narrowly tailored alternative: Referral to the State Bar for possible sanctions under the Rules of Professional Responsibility. *Somberg*, 582 F. Supp. 3d at 441. Because the Rules govern only the conduct of counsel participating in the case – not a bystander watching a Zoom feed at home – the alternative of Bar sanctions represents a fully adequate alternative to accomplish the government's legitimate objectives, without compromising the rights of journalists and other nonparticipants. In *Nye v. United States,* 313 U.S. 33, 49-50 (1941), the Supreme Court recognized a more narrowly tailored and speech-protective alternative to protect the courts' legitimate interests: Seeking prosecution for obstruction of justice, which – unlike contempt – cannot be summarily imposed by a judge. The existence of these fully adequate alternatives demonstrates that the Rebroadcasting Ban is not a narrowly tailored restriction on speech.

Finally, the Rebroadcasting Ban is constitutionally infirm because it contains no standards or guidelines to guard against retaliatory or viewpoint-discriminatory abuse. Anyone can take a snapshot of a video streaming on a computer screen at any time for personal use – thus, violating the Rebroadcasting Ban – and yet that amateur screen-shotter surely will never be punished, for the simple reason that the "offense" is undetectable. Who *will* be at risk of punishment are people like Somberg: People who not only take a photo, but who use the photo to comment unfavorably on the proceedings – or journalists or commentators whose coverage is regarded as unflattering.

## IV. THE TRIAL COURT FAILED TO ACKNOWLEDGE DECADES OF JUDICIAL DISFAVOR FOR "CONTEMPT BY PUBLICATION"

A rich body of federal caselaw recognizes that judges have minimal contempt authority to regulate what is said and published about court proceedings outside of the courtroom. The Supreme Court had held that a speaker cannot be held in contempt absent a showing that the speech presents "extremely high" imminence of bringing about "extremely serious" harm to judicial proceedings. *Bridges v. Calif.*, 314 U.S. 252, 193-94 (1941). The Court has repeatedly overturned sanctions for what is known as "contempt by publication" levied on journalists and commentators for their out-of-court speech. *See Pennekamp v. Florida*, 328 U.S. 331 (1946) (overturning contempt sanctions over editorial

16

column and political cartoons critical of judge's handling of ongoing criminal case, finding no interference with administration of justice); *Craig v. Harney*, 331 U.S. 367, 373 (1947) (vacating contempt convictions of reporter and publisher whose newspaper criticized judge for taking civil case away from jury, finding no "serious and imminent threat to the administration of justice"); *Wood v. Georgia*, 370 U.S. 375, 389 (1962) (ruling that sheriff who published sharp criticism of judge's handling of grand jury investigation could not be held in contempt absent a "showing of a substantive evil actually designed to impede the course of justice"). These cases were built on the recognition that speech about government proceedings and government officials occupies an especially protected place in the hierarchy of speech.

Applying this body of Supreme Court precedent, lower courts repeatedly have overturned sanctions against journalists, commentators, and other out-of-court speakers for speech purportedly disruptive of the courts. Consistently, courts have applied exacting scrutiny to contempt sanctions for speaking or publishing, and found that judges lacked authority to sanction news organizations for sharing lawfully obtained information, even when the information was purported to interfere with ongoing judicial proceedings. *See, e.g.*, *United States v. Dickinson*, 465 F.2d 496 (5th Cir. 1972) (vacating punishment imposed on reporters who disobeyed judge's order to refrain from reporting on evidence discussed at pretrial

17

hearing in civil-rights case against public officials). In declining to discipline an

attorney who told the news media that a trial judge "showed all the signs of being a

racist" in court, Oklahoma's Supreme Court noted that restricting the

dissemination of information about the judiciary interferes with the public's

constitutional right to receive information as well as the speaker's right to share it.

*State ex rel Oklahoma Bar Ass'n v. Porter*, 766 P.2d 958, 967 (Okla. 1988). In

particular, courts have readily overturned contempt sanctions where speakers were

punished for what they said about *completed* cases, because contempt is intended

to protect the conduct of *ongoing* cases. *See In Matter of Turner*, 174 N.W.2d 895,

904 (Mich. App. 1969) (following Supreme Court's *Bridges* and *Pennekamp*,

criminal contempt cannot lie against magazine publisher who accused judge of

corruption in regard to past cases, because contempt requires showing "an

immediate peril of undue influence or coercion upon *pending* litigation")

(emphasis added); *State v. Morris*, 406 P.2d 349, 357 (N.M. 1965) (overturning

contempt sanctions imposed on columnist for articles critical of judge's lenient

sentencing in vehicular manslaughter case against local prosecutor, where there

was no "imminent peril" to already-concluded case); *People of Virgin Islands v.*

*Brodhurst*, 148 F.2d 636, 643 (3d Cir. 1945) (reversing contempt citation imposed

on newspaper publisher over article critical of judge's handling of racially divisive

murder case, and observing: "The extraordinary power of a court to impose

18

summary punishment for criminal contempts of its authority is based upon the necessity for speedily and adequately dealing with conduct which obstructs the procedure of the court and prevents it from carrying out its judicial functions.").

Nothing in the Rebroadcasting Ban recognizes any distinction between acts that interfere with the administration of an ongoing case versus acts that, as in these afore-cited cases, advance public discourse about the administration of justice with no harm to fair-trial rights. Nothing about the act of clicking "save" on a screenshot is inherently disruptive to judicial proceedings so as to justify a categorical, non-tailored ban. The district court's failure to grapple with – or even acknowledge – this forceful body of precedent that constrains the authority of courts to enforce the Rebroadcasting Ban by way of contempt sanctions requires reversal.

## V. CONCLUSION

News media coverage of the courts serves an essential public-education function, enabling far more people than could ever sit in the courtroom to have the civic benefit of viewing the workings of the justice system for themselves.[5] The Supreme Court has itself recognized that news organizations are a proxy for public

---

[5] *See* Matthew Bender, *Unmuted: Solutions to Safeguard Constitutional Rights in Virtual Courtrooms and How Technology Can Expand Access to Quality Counsel and Transparency in the Criminal Justice System*, 66 VILL. L. REV. 1, 47 (2021) ("Convenient public access to courtrooms let the people gain a greater understanding of the judicial system and local cases. It also provides the public with a portal into the criminal justice system that does not exist when courtrooms are cloistered.").

attendance, helping assure that trials are conducted fairly and are accepted as legitimate by the populace. Video of judicial proceedings, whether broadcast by the news media or streamed directly by the court, provides the most complete record of what took place, rather than leaving the public to rely on second-hand accounts, the accuracy of which might be questioned. This is especially true in an era of hyper-partisan online commentary masquerading as news coverage, and "deepfake" or A.I.-generated imagery purporting to represent real events.

The First Amendment forcefully protects the rights of SPJ's and NPPA's members – as well as all members of the press and public interested in observing, chronicling, and commenting upon the administration of justice – to gather and share information about the judicial process in a non-disruptive way. The district court's failure to acknowledge the impact of the Rebroadcasting Ban on these fundamental rights, and to hold the government to a demanding standard of proof that the Ban is necessary as it is being broadly interpreted here, requires reversal.

Dated: January 5, 2024

Respectfully submitted,

*/s/ Andrew Geronimo*
ANDREW GERONIMO (OH# 86630)
andrew.geronimo@case.edu
*/s/ Sara E. Coulter*
SARA E. COULTER (OH# 96793)
sara.coulter@case.edu
*/s/ Siobhan Gerber*
SIOBHAN GERBER (OH# 101563)
siobhan.gerber@case.edu
**First Amendment Clinic**
MILTON & CHARLOTTE KRAMER LAW CLINIC
CASE WESTERN RESERVE UNIVERSITY SCHOOL OF LAW
11075 East Boulevard
Cleveland, Ohio 44106
Telephone: (216) 368-2766

*Counsel for Amicus Curiae The Society of Professional Journalists and the National Press Photographers Association*

## CERTIFICATE OF COMPLIANCE UNDER RULE 32(G)(1)

The undersigned counsel certifies that this brief was prepared in standard formatting (14 point Times New Roman font, 1-inch page margins) and contains no more than 6,500 words, exclusive of tables and other exempted material, as provided by Fed. R. App. P. 32(g)(1).

Dated: January 5, 2024

*/s/ Andrew Geronimo*
Andrew Geronimo

*Counsel for Amicus Curiae the Society of Professional Journalists and the National Press Photographers Association*